# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| TRADERS INTERNATIONAL, LTD., | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | CIVIL ACTION H-06-1632 |
| | § | |
| DAVID SCHEUERMANN, | § | |
| *Defendant.* | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

In accordance with the preliminary injunction issued in this action, and the hearing held on August 22, 2006, the court makes the following findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a).[1]

## FINDINGS OF FACT

1.     Plaintiff Traders International, Ltd. is an online educational company that offers instruction on commodity futures trading. The president of Traders is Afshin Taghechian. Traders International is a Texas limited partnership.[2] All partners are Texas residents.

2.     Defendant David H. Scheuermann, Jr. is a former student and instructor of Traders. Scheuermann enrolled as a student on July 26, 2003 and signed a non-disclosure and non-compete agreement. Scheuermann is a citizen of Louisiana.

---

[1]     To the extent that any finding of fact is more properly characterized as a conclusion of law, or vice versa, the court adopts it as such.

[2]     "Traders International, Ltd." was formerly known as "Traders International, Inc."

3.     Scheuermann filed an action against Traders in the Eastern District of Louisiana on April 17, 2006.  Traders filed suit against Scheuermann in Harris County District Court on April 18, 2006.  The Texas state suit was removed to this court on May 12, 2006.

4.     Traders contends that Scheuermann is disclosing its confidential and proprietary information; competing against it in violation of his non-competition agreement; encouraging Traders' customers to obtain fraudulent credit card refunds; spreading false information about Traders on the Internet; damaging its business reputation; and encouraging Internet users to make harassing phone calls to Taghechian's otherwise unlisted phone number.

5.     Jurisdiction and venue are disputed.  Traders' position is that Scheuermann and DHS Marketing, Inc. (a business operated by Scheuermann) have consented in writing to personal jurisdiction in the state and federal courts in Harris County, Texas, in a series of written agreements. Scheuermann denies signing those agreements containing a venue clause, but does admit signing the student agreement.

6.     The student agreement dated July 26, 2003 reads, in part: "The Student understands that during the training course he/she will gain access to Company's Proprietary Information. . . . [and that] Student agrees that he/she shall not . . . disclose to any person or entity any of Company's Proprietary Information."  The agreement adds:

> . . . Student agrees, that for a period of three (3) years after Student enrolls in Company's training courses, he/she will not utilize Company's Proprietary Information, directly or indirectly, on behalf of himself or on behalf of or in conjunction with others, as principal, agent, servant, or otherwise, to engage in, or have an interest in, the same or competitive line of business, or similar business enterprise, now carried on by Company anywhere in the world.

7.      Scheuermann began as an instructor for Traders in May 2005.  Traders maintains that he signed a second non-disclosure and non-compete agreement applicable to this new role on July 28, 2005.

8.      Traders contends this agreement was amended on November 9, 2005, at which time the parties executed three contracts: (1) an Independent Contractor Agreement; (2) a Consulting Agreement; and (3) a Confidentiality and Invention Agreement.

9.      The November 9, 2005 Confidentiality and Invention Agreement contains an integration clause.[3] This integration clause declares that the Confidentiality and Invention Agreement "sets forth the parties' mutual rights and obligations with respect to proprietary information, prohibited competition, and intellectual property."[4]  It adds that "[i]t is intended to be the final, complete, and exclusive statement of the terms of the parties' agreements regarding these subjects" and "supercedes all other prior and contemporaneous agreements and statements on these subjects . . . ."[5]

10.     The Confidentiality and Invention Agreement states that "In consideration of the Consultant relationship . . . the receipt of confidential information while associated with the Company, . . . the undersigned Consultant, agrees that: [he will abide by the remaining provisions of the agreements]."[6]  This includes promising not to "engage in any present or contemplated business activity that is or may be competitive with the Company (or any Affiliate) in any state where the Company conducts its business, unless the Consultant can prove that any action taken in contravention of this subsection

---

[3]      *See* Dkt. 11, Ex. 5, § 11.

[4]      Dkt. 11, Ex. 5, § 11.

[5]      Dkt. 11, Ex. 5, § 11.

[6]      Dkt. 11, Ex. 5.

(ii) was done without the use in any way of Confidential Information."[7]  This section also prohibits Scheuermann from employing, soliciting for employment, or recommending for employment, any person employed by Traders International.[8]  This non-competition and non-solicitation agreement lasts "during the relationship and for a period of one (1) year thereafter . . . ."[9]

11.     The Confidentiality and Invention Agreement provides that upon termination of the relationship, Scheuermann would return Traders' proprietary information.[10]  "Proprietary information" is broadly defined.[11]  "Confidential information" is also broadly defined to include "[a]ll Proprietary Information not generally known outside of the Company's organization . . . ." and provides a non-exclusive list of examples of such proprietary and confidential information.[12]

12.     The Confidentiality and Invention Agreement provides that "[t]he Consultant will not, directly or indirectly, use, make available, sell, disclose or otherwise communicate to any third party . . . any of the Company's Confidential Information, either during or after the relationship with the Company."[13]

13.     The Confidentiality and Invention Agreement has a venue selection clause declaring that "[t]his agreement shall be construed in accordance with, and all actions arising under or in connection

---

[7]      Dkt. 11, Ex. 5, § 4.2.

[8]      *See* Dkt. 11, Ex. 5, § 4.2.

[9]      Dkt. 11, Ex. 5, § 4.2.

[10]     *See* Dkt. 11, Ex. 5, § 6.

[11]     *See* Dkt. 11, Ex. 5, § 2.1.

[12]     Dkt. 11, Ex. 5, § 2.1.

[13]     Dkt. 11, Ex. 5, § 2.3.

therewith shall be governed by, the internal laws of the state of Texas with Harris County as the only allowable venue."[14]

14.     The Confidentiality and Invention Agreement stipulates that a breach of the agreement "will constitute immediate and irreparable damage to the Company, which cannot be fully and adequately compensated in money damages . . . ."[15]  It further provides that "only a one thousand dollar bond shall be required" to support an injunction.[16]

15.     Scheuermann denies signing any of the 2005 agreements.  Scheuermann counters that he was an independent contractor for Traders pursuant to a verbal agreement.[17]

16.     At the August 22, 2006 preliminary injunction hearing, Scheuermann testified that his thirteen-year old son, also named David Scheuermann, signed the July 28, 2005, and November 9, 2005 contracts.  Scheuermann further testified that he intended to rely on his son's signature as a type of "escape clause" to avoid liability under the contracts should the relationship with Traders not work out.  The defendant asserted that because the contracts did not specify "David Scheuermann" as a a person of majority status, he believed they did not identify him as a "legal person" and have no binding effect upon him.  Scheuermann stated that if Traders has a cause of action based on the 2005 contracts, it should bring suit against his minor son rather than seek redress from him.

17.     There is no evidence that Traders knew or should have known that the defendant's thirteen-year old son signed the contracts rather than the defendant.  In fact, the evidence is to the contrary.

---

[14]     Dkt. 11, Ex. 5, § 10.

[15]     Dkt. 11, Ex. 5, § 7.

[16]     Dkt. 11, Ex. 5, § 7.

[17]     *See* Dkt. 21, Ex. 2.

At the time of the 2005 contracts, Traders had a nearly two-year long relationship with David Scheuermann, Jr. There is no suggestion that Traders had any dealings with David Scheuermann III. Traders sent the proposed contracts to Scheuermann's home and they were mailed back to Traders with the signature of "David Scheuermann." Moreover, it was the defendant rather than the defendant's son who had been acting as an instructor for Traders since May of 2005 when the agreements formalizing the relationship were sent to David Scheuermann.

18.     The defendant performed under the contracts and accepted the benefits of the contracts. The defendant never informed Traders that it was his son that signed the contracts in his place.

19.     The court finds that by his actions and conduct, Scheuermann manifested his assent to the 2005 contracts. The court further finds that an objective party in Traders' position would reasonably believe that Scheuermann agreed to the contracts.

20.     The court further finds that Scheuermann falsely represented to Traders International that the signature on the 2005 contracts was his and concealed the fact that the signature was that of his son. This was a material fact. The court finds that Scheuermann did this knowingly; with the intent that Traders would act upon it; and that Traders relied upon this false representation/concealment to its prejudice and without knowing that Scheuermann did not in fact sign the contracts.

21.     In early 2006, the relationship between Traders and Scheuermann ended. Traders maintains it was due to poor performance reviews from students; Scheuermann alleges that it was due to his discovery of Traders' fraudulent business activities. The defendant alleges that representations made by Traders in promoting its courses were inaccurate. In particular, Scheuermann alleges that one of Traders' instructors was making simulated trades, but representing they were real transactions.

6

Scheuermann maintains that "No one at the company has ever traded the TI [Traders Intentional] method to make money."[18]

22.     After the relationship ended, the defendant began posting statements about Traders International, its president Afshin Taghechian, and Traders instructor Franz Shoar on the Internet. He started a finance "chat room" on Yahoo! called "davefromtradersinternational." He also posted a message forum on "Franz Shoar" on "Elite Trader"[19] using the moniker "tailhook." The defendant does not dispute that he in fact posted the messages as "davefromtradersinternational" and "tailhook."

23.     While an instructor with Traders, Scheuermann developed a trading system he refers to as a "pivot method." There is a substantial likelihood that if it represents genuine intellectual property, it belongs to Traders under the terms of the Confidentiality and Invention Agreement. Scheuermann is now competing with Traders by teaching this "pivot method."

24.     The defendant and/or the defendant's daughter, Ashleigh Scheuermann, a college student, posted messages encouraging Traders' customers to visit an online chat room that would provide training instruction identical to that which they received from Traders.[20] For instance, one message reads:

> Hi Guys,
>
> I am Ashleigh Scheuermann and I am Dave's oldest adult daughter. I am starting a trading Chat Room as a Business that I solely own. I am proud to announce that my Dad has signed up as my first paid subscriber as a student. At my sole discretion I

---

[18]     Dkt. 11, Ex. 6 (April 17, 2006 Yahoo! post).

[19]     Elite Trader's website is www.elitetrader.com.

[20]     Although some of the messages purport to be from Ashleigh Scheuermann, they are from the same IP address as messages acknowledged to be posted by the defendant.

will allow some students microphone access - everyone else will have open chat access as you are used to having. This room will run every Mon Tues and Wed from 8am - 11:30 am central time - Mon and Fri will also be included when ever possible but will not be guaranteed days. You will be paying my company and since I have never entered into any contract with any other companies nor have been a student of any other companies NO ONE can interfere with my own independent business. The cost will normally be $195 per month but since we are in May - the remainder of this month will be only $95. There are no long term commitments - You can chose to stop or start any time. If you would like to sign up you can call us at 1-800-432-6865 or email me back at twopointsaday@...

Thank You

Ashleigh Scheuermann[21]

This was also posted the same day: "I just hope everyone understands that my room will be EXACTLY like you were used too [sic] and EXACTLY what you are looking for if you wanted to still be in the mentorship room run by my dad."[22]   The next day the defendant posted this message: "if you liked the way I ran the mentorship room I promise you will absolutely Love this room - so you really dont need a trial - you should know what to expect."[23]

25.    The defendant has also directly solicited Traders' customers in online chat rooms and message forums:

> So dont think you have to pay those frauds $5,000 *to get the same material* - then if you want to learn it - you can contact me and join my room - take that $5,000 and take a trip to Europe or open your trading account with that money that Afshin would try to get you to pay him.[24]   (emphasis added).

 As well as this posting:

---

[21]      Dkt. 11, Ex. 6 (May 8, 2006 Yahoo! post).

[22]      Dkt. 11, Ex. 6 (May 8, 2006 Yahoo! post).

[23]      Dkt. 11, Ex. 6 (May 9, 2006 Yahoo! post).

[24]      Dkt. 11, Ex. 7 (July 22, 2006 Elite Trader post).

THAT IS WHAT I TEACH WITHOUT A $5,000 UP FRONT FEE - IN FACT NO
UP FROM FEE>.  That has got to be killing you Afshin - and guess what soon very
soon I am going to market it to the world - FREE Lets see Afshin my room has been
running for over 2 months and you can't stop me.[25]

26.     The defendant has apparently solicited Traders' employees.  In one post, the defendant states

that "I am trying to bring them in [especially the office staff of Traders] to anything I start."[26]

27      The defendant has also posted several scripts used by Traders International in its courses.[27]

These scripts appear to fall under the Confidentiality and Invention Agreement's classification of

proprietary information as "all information and any idea whatever form, tangible, or intangible,

pertaining in any manner to the business of the Company . . . ."[28]

28.     The defendant has filed for bankruptcy three times and may be judgment proof should Traders

International succeed on the merits of its claims.

29.     Scheuermann admits giving Traders' confidential and proprietary information to governmental

authorities.  Scheuermann maintains this was done to expose fraudulent activity.


## CONCLUSIONS OF LAW

1.      In order to prevail on a motion for preliminary injunction, a party must show: (1) a substantial

likelihood of success on the merits; (2) a substantial threat that it will suffer irreparable injury if the

injunction is denied; (3) the potential injury outweighs any damage that the injunction may cause the

---

[25]     Dkt. 11, Ex. 7 (July 17, 2006 Elite Trader post).

[26]     Dkt. 11, Ex. 6 (April 16, 2006 Yahoo! post).

[27]     *See, e.g.*, Dkt. 6 (May 8, 2006 Yahoo! post #553); Dkt. 6 (May 8, 2006 Yahoo! post #555); Dkt. 6 (August 5, 2006 Yahoo! post).

[28]     Dkt. 11, Ex. 5, § 2.1.

non-moving party; and (4) granting the preliminary injunction will not disserve the public interest. *See Guy Carpenter & Co., Inc. v. Provenzale*, 334 F.3d 459, 464 (5th Cir. 2003); *Evergreen Presbyterian Ministries Inc. v. Hood*, 235 F.3d 908, 918 (5th Cir. 2000).

2.    A preliminary injunction is an extraordinary remedy which will only be granted if the movant has clearly carried the burden as to all four elements. *Guy Carpenter*, 334 F.3d at 464; *Evergreen Presbyterian*, 235 F.3d at 917.

### Substantial Likelihood of Success

3.    The court finds as a matter of law that Scheuermann is bound by the November 9, 2005 contracts under any one of at least three alternative theories: (1) his objective manifestation of assent to the contracts; (2) his ratification of the agreements by performance and acceptance of the benefits of the contracts; or (3) equitable estoppel.

4.    The elements of a valid contract are (1) an offer; (2) an acceptance; (3) a meeting of the minds; (4) each party's consent to the terms, and in the case of a written contract; (5) execution and delivery of the contract with the intent that it be mutual and binding. *Baroid Equip., Inc. v. Odeco Drilling, Inc.*, 184 S.W.3d 1, 17 (Tex. App.—Houston [1st Dist.] 2005, pets. denied); *Choctaw Props., L.L.C. v. Aledo I.S.D.*, 127 S.W.3d 235, 245 (Tex. App.—Waco 2003, no pet.). Determining whether there was a meeting of the minds, and thus an offer and acceptance, is based on the objective standard of what the parties said and did; their subjective state of mind is not relevant. *Baroid Equip., Inc.*, 184, S.W.3d at 17; *Choctaw Props.*, 127 S.W.3d at 245-46.

5.    Under Texas law, the existence of a contract can be implied from the parties' actions and conduct that indicate a mutual intent to be bound by their respective obligations. *See Railroad Mgmt. Co. v. CFS Louisiana Midstream Co.*, 428 F.3d 214, 222 (5th Cir. 2005); *Haws & Garrett Gen.*

*Contractors, Inc. v. Gorbett Bros. Welding Co.*, 480 S.W.2d 607, 609 (Tex. 1972); *KW Constr. v. Stephens & Sons Concrete Contractors, Inc.*, 165 S.W.3d 874, 885 (Tex. App.—Texarkana 2005, pet. denied).  A party's conduct may serve as acceptance of an offer to form a contract where a party's actions are calculated to lead the offeror to believe that the offer had been accepted.  *See Railroad Mgmt.*, 428 F.3d at 222; *Montgomery County Hosp. Dist. v. Brown*, 965 S.W.2d 501, 502 (Tex. 1998) ("a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made" may constitute acceptance sufficient to form a valid contract) (citation omitted).

6.      Moreover, for a contract to be valid, it is not necessary that the agreement be signed by both parties; if one party signs, the other may accept the agreement by his acts, conduct, or acquiescence in the terms of the contract.  *See Lee & Lee Int'l, Inc. v. Lee*, 261 F. Supp. 2d 665, 672 (N.D. Tex. 2003) (citing *Hearthshire Braeswood Plaza Ltd. P'ship v. Bill Kelly Co.*, 849 S.W.2d 380, 392 (Tex. App.—Houston [14th Dist.] 1993, writ denied)).

7.      Scheuermann acted in a manner evincing his agreement and assent to the contracts with Traders International.  *Cf. Karl Rove & Co. v. Thornburgh*, 39 F.3d 1273, 1292-93 (5th Cir. 1994) (Senatorial candidate bound by contract entered into by his campaign committee where the candidate knew of the agreement, played a direct role in the fulfillment of the contract, understood that letters were written on his behalf, and knew funds raised were used for his election).

8.      In the alternative, the court finds that Scheuermann ratified the 2005 contracts by acting and performing under them and is therefore bound by the agreements.[29]  Ratification occurs if a party recognizes the validity of a contract by acting or performing under the contract or by otherwise

---

[29]      *See* Finding of Fact 18.

11

affirmatively acknowledging it. *See Missouri Pac. R.R. Co. v. Lely Dev. Corp.*, 86 S.W.3d 787, 792 (Tex. App.—Austin 2002, pet. dism'd) (citing cases).

9.      In the third alternative, the court finds that Scheuermann is equitably estopped from denying that he is bound by the 2005 contracts.  Under Texas law, equitable estoppel may be warranted where there is: (1) a false representation or concealment of material facts made with knowledge (actual or constructive) of those facts; (2) with the intention that it should be acted on; (3) to a party without knowledge, or means of knowledge of those facts; (4) who detrimentally relied upon those representations.  *See Monumental Life Ins. Co. v. Hayes-Jenkins*, 403 F.3d 304, 311 (5th Cir. 2005); *Medical Care Am., Inc. v. National Union Fire Ins. Co. of Pittsburgh, Pennsylvania*, 341 F.3d 415, 422 (5th Cir. 2003).  Each of these has occurred.[30]

10.     In particular, the court finds that Scheuermann is legally bound by the Confidentiality and Invention Agreement.  This is significant because this contract "sets forth the parties' mutual rights and obligations with respect to proprietary information, prohibited competition, and intellectual property."  Other important provisions, such as those establishing personal jurisdiction over Scheuermann and venue in this district, providing for non-disclosure of Traders' confidential information, and directing the resolution of disputes by arbitration, may be enforceable under any or all of the November 9, 2005 contracts.[31]  But the court will focus on the non-compete clause in the Confidentiality and Invention Agreement due to its integration clause and because that provision requires the most analysis.

---

[30]     *See* Findings of Fact 16-18.

[31]     The non-disclosure agreement Scheuermann signed as a student may also apply to those disclosures made by Scheuermann before July 2006.

11.     The enforceability of a non-compete agreement is a question of law for the court.  *Light v. Centel Cellular Co. of Texas*, 883 S.W.2d 642, 644 (Tex. 1994).  For the reasons which follow, the court finds that the non-compete clause of the Confidentiality and Invention Agreement is enforceable.

12.     Texas Business and Commerce Code Section 15.50 governs covenants not to compete.  This statute provides that

> Notwithstanding Section 15.05 [which generally declares restraints on competition unlawful] of this code . . . a covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

TEX. BUS. & COM. CODE ANN. § 15.50(a) (Vernon 2002).

13.     The Texas Supreme Court construed the language "ancillary to or a part of the otherwise enforceable agreement" as requiring that: (1) the consideration given by the employer in the otherwise enforceable agreement must give rise to the employer's interest in restraining the employee from competing; and (2) the non-competition covenant must be designed to enforce the employee's consideration in the otherwise enforceable agreement.  *Light*, 883 S.W.2d at 647.

14.     These requirements may be met where a contemporaneous exchange of promises (to grant access to information and correspondingly not to disclose it) constitutes an otherwise enforceable agreement "at the time the agreement is made."  *See Guy Carpenter*, 363 F.3d at 465-66; *Light*, 883 S.W.2d at 647 n.14 ("[I]f an employer gives an employee confidential and proprietary information or trade secrets in exchange for the employee's promise not to disclose them, and the parties enter into a covenant not to compete, the covenant is ancillary to an otherwise enforceable agreement . .

13

. .").  This is a valid bilateral contract that an employer would breach if it terminated the employee without ever having provided access to the confidential information.  *See Oxford Global Res., Inc. v. Weekley-Cessnun*, 2005 WL 350580, at *5 (N.D. Tex. 2005).

15.     The Confidentiality and Invention Agreement states that "In consideration of the Consultant relationship . . . the receipt of confidential information while associated with the Company, . . . the undersigned Consultant, agrees that: [he will abide by the remaining provisions of the agreements]",[32] including the promise not to "engage in any present or contemplated business activity that is or may be competitive with the Company (or any Affiliate) in any state where the Company conducts its business, unless the Consultant can prove that any action taken in contravention of this subsection (ii) was done without the use in any way of Confidential Information."[33]  The court finds that this is a valid bilateral contract with an enforceable agreement not to compete.

16.     Although the Confidentiality and Invention Agreement does not specify a geographic limitation on the non-competition agreement, it is nonetheless enforceable.  While there is a split of authority on this legal issue,[34] the court is persuaded that where the employment agreement restricts the employee from contacting former customers with whom the employee dealt while employed by the employer, this is a reasonable substitute for a geographic limitation.

17.     The fact that Scheuermann was an independent contractor rather than an employee does not impact the enforceability of the non-compete or non-disclosure agreements.  *See American Express Fin. Advisors, Inc. v. Scott*, 955 F. Supp. 688, 692 n.2 (N.D. Tex. 1996).

---

[32]     Dkt. 11, Ex. 5.

[33]     Dkt. 11, Ex. 5, § 4.2.

[34]     *See Totino v. Alexander & Assoc., Inc.*, 1998 WL 552818, at *3- *4 (Tex. App.–Houston [1st Dist.] 1998) (listing cases taking both positions).

18.     Non-disclosure agreements are generally not considered to be restraints of trade under Texas law and are therefore not subject to the requirements governing the enforceability of non-competition agreements.  *See Guy Carpenter & Co., Inc. v. Provenzale*, 334 F.3d 459, 465 (5th Cir. 2003).  In particular, a non-disclosure agreement that is a unilateral contract (*e.g.*, an offer by an employee to keep confidential such information as an employer elects to disclose) may be valid.  *See Oxford Global Res., Inc. v. Weekley-Cessnun*, 2005 WL 350580, at *4 (N.D. Tex. 2005); *Light*, 883 S.W.2d at 645 n.6.

19.     Because the non-competition and non-disclosure clauses of the Confidentiality and Invention Agreement and other contracts are enforceable, there is a substantial likelihood of success that Traders will prevail on the merits of its claims.  By competing with Traders, disclosing its confidential information, and soliciting its customers, Scheuermann has breached his agreements and therefore may be held liable to Traders.

## Irreparable Injury

20.     Traders maintains irreparable harm has been stipulated to by the terms of the contracts.  Contractual stipulations of "irreparable harm," however, are insufficient by themselves to support a finding of irreparable harm to support injunctive relief.  *See Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1266 (10th Cir. 2004); *Smith, Bucklin & Assocs., Inc v. Sonntag*, 83 F.3d 476, 481 (D.C. Cir. 1996); *Baker's Aid v. Hussmann Foodservice Co.*, 830 F.2d 13, 16 (2d Cir. 1987).

21.     Nevertheless, the disclosure of confidential information satisfies the irreparable injury prong for purposes of a preliminary injunction.  *Cf. FMC Corp. v. Varco Int'l, Inc.*, 677 F.2d 500, 504-05 (5th Cir. 1982); *Weed Eater, Inc. v. Dowling*, 562 S.W.2d 898, 902 (Tex. Civ. App.—Houston [1st

Dist.] 1978, writ n.r.e.).  More significantly, Scheuermann is competing against Traders in violation of the Confidentiality and Invention Agreement.  *See American Express Fin. Advisors, Inc. v. Scott*, 955 F. Supp. 688, 693 (N.D. Tex. 1996) ("In Texas, injury resulting from the breach of non-compete convenants is the epitome of irreparable injury"); *see also* TEX. BUS. & COM. CODE ANN. § 15.51(a) (Vernon 2002).  There is a substantial possibility that Sheuermann's continued efforts to solicit Traders' customers will result in those customers terminating their relationship with Traders.  Based on this, the court finds that Traders has carried its burden of establishing irreparable injury to support a preliminary injunction.

22.     In addition, Scheuermann's insolvency may be weighed by the court in determining whether there is an adequate remedy at law for purposes of injunctive relief.  *See Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 848-49 (5th Cir. 2004); *Texas Indus. Gas v. Phoenix Metallurgical Corp.*, 828 S.W.2d 529, 533 (Tex. App.—Houston [1st Dist.] 1992, no writ).  Scheuermann has filed for bankruptcy in the Eastern District of Louisiana, and should Traders ultimately prevail on the merits, Scheuermann may not be able to satisfy any judgment against him.

### Balance of Potential Injuries

23.     The potential injury to Traders outweighs the potential injury posed by the injunction to Scheuermann.  *See Jak Prods., Inc. v. Wiza*, 986 F.2d 1080, 1084-85 (7th Cir. 1993) (balance of hardships weighed in favor of preliminary injunction against former employee soliciting former employer's customers for one year after leaving employment); *Meditronic, Inc. v. Gibbons*, 527 F. Supp. 1085, 1094-95 (D. Minn. 1981) (balance of potential harm weighed in favor of granting preliminary injunction restraining sales representative from violating terms of a restrictive covenant).

16

In the absence of a preliminary injunction, Traders may lose customers and proprietary and confidential information.

24.     The potential injury to Scheuermann presented by the injunction is minimal.  Scheuermann has testified that he is involved with at least two business ventures, including DHS Marketing, Inc., which provide an alternative source of income to running an online instruction course competing with Traders.  Moreover, there is nothing in the contracts or the preliminary injunction to prevent Scheuermann from exercising his expertise as a financial trader to participate in the financial markets directly on his own behalf and earn income in that manner.  Finally, any harm that an injunction may cause Scheuermann will be compensated for by the bond required of Traders should Traders not prevail on the merits.

### Public Interest

25.     The court concludes that the public interest is served by upholding the parties' contractual obligations and that the public interest will not be disserved by the granting of the injunction.  *See Missouri, K&T, Ry. Co. of Texas v. Carter*, 95 Tex. 461, 476 (1902) ("The power to make contracts is too valuable a right to be lightly swept away under the general declaration that such contracts are contrary to public policy . . . ."); *Westchester Fire Ins. Co. v. Admiral Ins. Co.*, 152 S.W.3d 172, 186 (Tex. App.—Fort Worth 2004, pet. filed); *see also H&R Block Enters., Inc. v. Short*, 2006 WL 640508, at *4 (D. Minn. 2006); *R.J. Gators Franchise Systems, Inc. v. MBC Rests., Inc.*, 2005 WL 4655379, at *5 (M.D. Fla. 2005) (public interest not disserved by enforcing valid covenant not to compete and encouraging adherence to contractual obligations); *National Bus. Servs., Inc. v. Wright*, 2 F. Supp. 2d 701, 709 (E.D. Pa. 1998) (public interest served by upholding freely entered restrictive covenant and preventing the misappropriation and wrongful use of confidential information);

17

*AmeriGas Propane, Inc. v. Crook*, 844 F. Supp. 379, 390 (M.D. Tenn. 1993) (enforcement of post-employment agreement serves the public interest).

**Bond**

26.     As a final matter, the court will address the requirement of a bond.  The Confidentiality and Invention Agreement provides that "only a one thousand dollar bond shall be required" to support an injunction and therefore Traders requests that bond be set at this contractually specified amount.[35] It is not clear that the security required for the issuance of a preliminary injunction may be stipulated to by contract.  Instead, the court will look to the language of Federal Rule of Civil Procedure 65(c), which states:

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

FED. R. CIV. P. 65(c).

27.     The court finds that the amount of damages that Scheuermann may incur as a result of this injunction is relatively minimal and that because there is little likelihood that it will later be found that Scheuermann has been wrongfully enjoined, the proper amount for security need not be significant. While admittedly inexact, the court will nevertheless attempt to gauge the damages that Scheuermann may suffer if he is improperly restrained from competing with Traders. The record suggests that Scheuermann and those acting on his behalf are attempting to charge $195 per month for enrollment in a course competitive with Traders.  The record contains expressions of interest from at least two

---

[35]     Dkt. 11, Ex. 5, § 7.

persons in Scheuermann's competing course.[36]   Assuming hypothetically that there are four such persons who would sign up for Scheuermann's competing course, and subscribe to it for three months each, this would amount to $2,340.00 over a one year period.   Therefore, bond will be set in that amount.

Signed at Houston, Texas on August 30, 2006.

_____
Gray H. Miller
United States District Judge

---

[36]   Dkt. 11, Ex. 6 (May 9, 2006 Yahoo! post by "Cathy Stieb" and May 28, 2006 Yahoo! post by "morpheustrader").